## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| GOT I, LLC and KIDS II, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION |
| vs. | ) | |
| | ) | FILE NO. 1:16-CV-00038-WSD |
| XRT, INC. and DAVID EUGENE | ) | |
| SILVERGLATE, | ) | |
| | ) | |
| Defendants/Counterclaimants | ) | |

Defendants XRT and David Silverglate submit the following statement

pursuant to the Court's December 21, 2016 Order (Dkt. No. 93).

## FACT DISCLOSURE

**I.     Defendants' legal claims for which they are entitled to a remedy.**

**1.     Breach of contract.**   Kids II and GOT I breached the Royalty

Agreement by failing to pay Mr. Silverglate and XRT the agreed upon royalties for

at least 60 separate product SKUs.  Instead of paying the ▉% royalty rate owed on

Newly Developed Products, Kids II misclassified products in order to pay rates as

low as ▉%.  Kids II and GOT I ultimately failed to pay over ▉▉▉▉▉ in royalties

between 2012 and July 1, 2016, when Mr. Silverglate and XRT formally

terminated the Royalty Agreement due to this material breach.

Mr. Silverglate made numerous inquiries about the misclassifications before

terminating the contract, but could not receive a straightforward explanation for

how Kids II classified the products.  Nor did Kids II ever explain why it abruptly

changed how it paid royalties on certain products.  For instance, Kids II paid ▉%

1

on the Oball cars for three years, but without warning reduced the rate to ▮% in 2015.  Eventually, XRT's intellectual property attorney wrote to Kids II, respectfully inquiring about the apparent discrepancies (all while noting that XRT continued to value its relationship with Kids II and hoped to continue with it).  Kids II responded by suing Mr. Silverglate and XRT.



2.      **Breach of the covenant of good faith and fair dealing.**  Kids II and

GOT I breached the covenant of good faith and fair dealing by threatening to

design around the Oball products (to avoid making any royalty payments) if Mr.

Silverglate did not accept Kids II's low-ball buy out of the remaining term of the

Royalty Agreement.  Meanwhile, hoping to convince Mr. Silverglate to accept a

cheap buy out, Kids II falsely told Mr. Silverglate that the Oball division would

---

[1] On numerous occasions during the 13 depositions, Kids II's litigation counsel told the witness "you can answer yes, no, or I don't know." (See, e.g. Jackson Dep. Tr. 48:13-18 (Q:… Have you seen Schedule A [to the Royalty Agreement] used at Kids II?" MR. LOWRIE: "You can answer yes or no.").

never reach $▮▮ million in annual sales (which was Kids II's stated revenue goal during the acquisition).  In truth, however, at the same time he was misinforming Mr. Silverglate about the state of Oball sales, Kids II's head of product development informed both the CEO and CFO that the Oball division could

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## II.    Damages.

On July 1, 2016, XRT and Mr. Silverglate formally terminated the Royalty Agreement pursuant to paragraph 11 of the agreement due to Kids II and GOT I's material breach of contract and breach of the covenant of good faith and fair dealing.  XRT and Mr. Silverglate are entitled to damages in an amount that will place them in the same position as if the Royalty Agreement had been properly performed.  *See In re El Paso Pipeline Partners, L.P. Derivative Litig.,* C.A. No. 7141-VCL, 2015 WL 1815846, at *25 (Del. Ch. Apr. 20, 2015) ("It is a basic principle of contract law that remedy for a breach should seek to give the nonbreaching the party the benefit of its bargain by putting that party in the position it would have been but for the breach." (*quoting Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000)).

4

Here, the benefit of the bargain means both (a) past due royalties that were not paid from 2012 to July 1, 2016; and (b) future royalties that would have been paid had the contract been properly performed for the entire 75-year term of the Royalty Agreement.  Because the Royalty Agreement is contingent consideration for the sale of the Rhino Toys/Oball assets, Kids II, in turn, will keep all of the Oball and Rhino Toys' assets and intellectual property that it acquired on December 30, 2010.

      1.      **Unpaid, past-due royalties (from 2012 to July 1, 2016).**

      A.      **Amount claimed:** ▇▇▇▇▇

      B.      **Factual basis.**  Between 2012 and July 1, 2016 (when XRT terminated the Royalty Agreement), Kids II misclassified at least 60 separate product SKUs under the Royalty Agreement and failed to pay royalties owed.  The difference between the amount actually paid ▇▇▇▇▇ and the amount that should have been paid ▇▇▇▇▇ is ▇▇▇▇▇  This is the amount that is past due and owing.  From January 1, 2012 to December 31, 2015, Kids II and GOT I withheld an increasing amount of royalties due to Mr. Silverglate and XRT, as reflected in the chart below:



**C.    Documents.**  The documents supporting the unpaid, past-due royalties from 2012 to July 1, 2016, are the Royalty Reports from Kids II to XRT.

**D.    Person with knowledge.**  The person with the most comprehensive knowledge about the amount and calculation of underpaid royalties is Sheila Kellerman and Sue Pener of SJ Kellerman & Associates, and John Shurley of Warren Averett LLP.  The person most knowledgeable about how

particular products should be classified under the Royalty Agreement is David Silverglate.

      **2.**      **Future royalties (from July 1, 2016 through the remaining term of the Royalty Agreement).**

          **A.**      **Amount claimed.** ████████████████████████

          **B.**      **Factual basis**. In 2010, Kids II sought to purchase the assets of Rhino Toys, including its intellectual property, outright. Kids II, however, refused to pay Mr. Silverglate his asking price. Instead, Mr. Silverglate took two separate risks. First, the deal was structured as an "earn out": Mr. Silverglate transferred the Rhino Toy assets and intellectual property to GOT I for a reduced up front purchase price, and shifted the majority of the consideration to a 75-year residual royalty on sales of Oball and Rhino related products. Second, Mr. Silverglate agreed that for a number of years, Kids II would receive the first $5 million in Oball sales royalty-free. In other words, Kids II received a $5 million annual cushion of royalty-free sales before Mr. Silverglate could earn any royalties.

      Thus, by making the consideration for the purchase of the Rhino Toys assets and intellectual property contingent on the products' later success, Mr. Silverglate took a substantial risk in return for the possibility of an increased future reward. As a result of Kids II and GOT I's material breach, XRT and Mr. Silverglate are now entitled to receive the future royalties that would have been paid had the contract been properly performed for the remainder of the 75-year term. *See Duncan v. Theratx, Inc.,* 775 A.2d 1019, 1022 (Del. 2001) ("[T]he standard remedy for breach of contract is based upon the reasonable expectations of the parties ex ante. This principle of expectation damages is measured by the amount

of money that would put the promisee in the same position as if the promisor had performed the contract." (citing Restatement (Second) of Contracts § 347 cmt. a)). In essence, Kids II now owes the balance of the contingent consideration for the purchase of the Oball and Rhino Toys' assets and intellectual property.  Plaintiffs, in turn, retain ownership of the Oball/Rhino Toys assets and intellectual property.

## Discounted Cash Flow Analysis

To calculate a prospective economic loss, a methodology called a discounted future cash flow analysis is used.  The prospective economic loss is "discounted" to determine the present value of that prospective economic loss as of the date of trial.  The discounted cash flow approach is based on the premise that the value of an asset is the present value of the future economic income (i.e., cash flow) to be derived by the owners of the asset.

The discounted cash flow method has two key components: (1) a determination of the discount rate used to calculate the "present value" of the future anticipated cash flow stream; and (2) future cash flows (e.g. sales projections) must be estimated over the assumed damage period.

### Discount rate

The discount rate is often called a rate of return.  The discounted future cash flow method requires the determination of a 'future benefit stream,' (a numerator), and a rate of return (i.e. the risk) (a denominator).  Defendants engaged John Shurley of Warren Averett as a damages expert.  Mr. Shurley's CV is attached as **Exhibit 5**.  Mr. Shurley was tasked to determine the appropriate discount rate for defendants' damages analysis.  He analyzed, among other things, plaintiffs' revenues, expenses, capital structure, residual value, and the cost of capital

8

(including an examination of business, financial, and systematic risk).  Based on his analysis to date, he believes that 16% is a reasonable discount rate.

Future cash flows/sales projections

Defendants retained Richard Gottlieb, of Global Toy Experts, to determine the future sales of Oball products for the remaining term of the Royalty Agreement.  Mr. Gottlieb's CV is attached as **Exhibit 3**.  His expert report is attached as **Exhibit 4**.  Generally, in order to provide a data-based forecast, Mr. Gottlieb considered the five-years of actual Oball sales, Kids II's five year internal forecast, Toy Industry Historical Annualized Growth, and product lifecycle.  He also identified a number of comparables, including the Nerf ball.  Mr. Gottlieb prepared a "high" and a "low" sales forecast, which is largely based on average annual toy growth rates in the United States (3.68%), and outside of the United States (6.43%).

As explained in detail in Mr. Gottlieb's report, he forecasts the following revenue milestones:



**Damages Analysis**

Mr. Shurley relied on Mr. Gottlieb's expert report and future Oball sales projection, applied the 16% discount rate, and then performed a discounted cash flow analysis.  An exhibit reflecting his discounted cash flow analysis is attached as **Exhibit 6**.  Mr. Shurley has opined that damages, depending upon sales

projections and effective future royalty rate, is ███████████████████

████████████

        **C.**     **Documents.**  The documents supporting the discounted cash flow analysis are plaintiffs' financial statements (including profit and loss statements, balance sheets, audited financial statements, and monthly financial reports).  The documents supporting the projected sales are plaintiffs' financial statements, plaintiffs' sales projections and internal forecasts, plaintiffs' board of advisor minutes, plaintiffs' plans for Oball (reflected in internal emails and presentations), and Oball designs and drawings, and royalty reports.

        **D.**     **Persons with knowledge.**  Richard Gottlieb is the person with the most comprehensive knowledge about Kids II's future sales of Oball products. John Shurley is the person with the most comprehensive knowledge about the discounted cash flow analysis.

     **3.**     **Prevailing Party attorney fees.**

        **A.**     **Amount.**  To be determined following trial.

        **B.**     **Factual basis**.  The Royalty Agreement provides for the award of prevailing party attorney fees in the event of a dispute over the agreement.

        **C.**     **Documents**.  The Royalty Agreement and attorney invoices.

        **D.**     **Person with knowledge**.  Mr. Silverglate and undersigned counsel are the persons with the most comprehensive knowledge about defendants' attorney fees.

     **4.**     **Product lists.**

        **A.**     **Commercialized products subject to Royalty Agreement.** Attached as **Exhibit 1** is a list of each commercialized product XRT and Mr.

Silverglate contend are subject to the Royalty Agreement, organized by the date first sold.

**B.** **Newly Developed Products (and misclassified products) covered by Royalty Agreement.** Attached as **Exhibit 2** is a chart listing all Newly Developed Products and all additional products that are misclassified. The chart includes the correct product classification under the Royalty Agreement, the basis for the classification, the correct royalty rate, and the royalty rate that was actually paid.

C. **Intellectual Property and Proprietary Technology.** Newly Developed Products include products "based on or derived from intellectual property or proprietary technology embodied in the Existing Products." "Intellectual property" includes: (1) trademarks; (2) trade dress; (3) designs/conceptions listed on Schedule A to the Royalty Agreement; or (4) patents. "Proprietary technology" refers to the chemicals, materials, and manufacturing process for creating the spongy, teethable, and flexible linked loop surfaces characteristic of Oball products. The chart attached as **Exhibit 2** identifies in detail the particular intellectual property or proprietary technology, on a per product basis, that necessitates a Newly Developed Product classification.

Respectfully submitted, this 5th day of January, 2017.

FELLOWS LABRIOLA LLP

By: s/Henry D. Fellows, Jr.
Renée E. Rothauge (*pro hac vice*)
Oregon Bar No. 903712
Adam M. Starr (*pro hac vice*)

Oregon Bar No. 125393
1211 SW Fifth Avenue, Suite 3000
Portland, OR 97204
Telephone: (503) 295-3085
Facsimile: (503) 323-9105
reneerothauge@markowitzherbold.com
adamstarr@markowitzherbold.com

Henry D. Fellows, Jr.
Georgia Bar No. 257825
Amy Durrence
Georgia Bar No. 170398
FELLOWS LABRIOLA LLP
Suite 2300 South Tower
225 Peachtree Street, NE
Atlanta, GA 30303
Telephone: (404) 586-9200
Facsimile: (404) 586-9201
hfellows@fellab.com
adurrence@fellab.com

*Counsel for Defendants XRT, Inc.*

*and David Eugene Silverglate*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing using the Court's

CM/ECF system which will automatically send notice of the filing to the following

counsel of record:

> Scott P. Amy, Esq.
> scott.amy@thomashorstemeyer.com
> Wesley Roberts, Esq.
> wesley.roberts@thomashorstemeyer.com
> Thomas Horstemeyer LLP
> 400 Interstate North Parkway SE
> Suite 1500
> Atlanta, GA 30339
>
> Matthew B. Lowrie, Esq.
> mlowrie@foley.com
> Matthew A. Ambros, Esq.
> mambros@foley.com
> Ruben J. Rodrigues, Esq.
> rrodrigues@foley.com
> Ellen T. Wong, Esq.
> ewong@foley.com
> Joel T. Diamond, Esq.
> jdiamond@foley.com
> Foley & Lardner LLP
> 111 Huntington Avenue, Suite 2600
> Boston, MA 02199

This 5th day of January, 2017.

> s/Henry D. Fellows, Jr.
> Henry D. Fellows, Jr.