**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**GOT I, LLC and KIDS II, INC.,**

           **Plaintiffs,**

      **v.**                               **1:16-cv-38-WSD**

**XRT, INC. and DAVID EUGENE
SILVERGLATE,**

           **Defendants.**

**OPINION AND ORDER**

This matter is before the Court on Plaintiffs GOT I, LLC ("GOT I") and

Kids II, Inc.'s ("Kids II") (together, "Plaintiffs") Motion for Partial Summary

Judgment of No Material Breach [119], Motion to Strike Expert Reports of John

Shurley and Richard Gottlieb [122], Motion for Partial Summary Judgment of No

Damages [148], and Motion for Partial Summary Judgment of No Partial Breach of

Contract [151]. Defendants XRT, Inc. ("XRT") and David Eugene Silverglate's

(together, "Defendants") oppose each of those motions.

**I.      BACKGROUND**

      A.     <u>Facts</u>

This is a contract dispute regarding the royalties due under a Royalty

Agreement [120.3] entered into by Plaintiffs and Defendants. GOT I, XRT

(formerly known as Rhino Toys), and David Silverglate entered into an Asset

Purchase Agreement [120.2] ("APA") on December 30, 2010. GOT I purchased

from XRT all of the "Acquired Assets," as that term is

defined in Section 1.1 of the APA. The Acquired Assets

included XRT's "OBALL" toy product line and related



intellectual property. (Id.) The APA specified the

estimated cash purchase price as $4,500,000.[1] ([120.2] at

**Fig. 1:  Oball**

§ 3.1(c)). The APA further required that Kids II, Got I,

and XRT enter into the Royalty Agreement. ([120.2] at § 4.2(f)). The APA and

the Royalty Agreement both provide that Delaware law governs the interpretation

and construction of the contracts. ([120.2] at § 15.11; [120.3] at § 18).

1.    The Royalty Agreement

The Royalty Agreement incorporates the APA by reference. ([120.3] at 2).

It explains that "all Royalty Payments made pursuant to this Agreement are part of

the Purchase Price (as defined in the APA) for the Acquired Assets (as defined in

the APA) pursuant to the APA." ([120.3] at § 2(d)).

---

[1]    The actual cash purchase price appears to be at least $4,450,000. ([145.2] at
5 No. 9). Defendants do not dispute that they received a total of more than
$6,450,000 under both the APA and Royalty Agreement through Q1 2016 or that
royalties up to that point account for $1,999,435 of that total figure. (Id.).

The Royalty Agreement provides for royalties to be paid by GOT I to XRT

on three separate categories of products to be manufactured, marketed, and sold by

Kids II: (i) "Existing Product Lines"; (ii) "Newly Developed Product Lines"; and

(iii) "Combined Product." The Royalty Agreement defines Existing Product

Line(s) as:

> (i) the current product lines of Seller which were actually sold in the marketplace as of the Closing Date; (ii) former product lines of Seller which were previously sold in the marketplace prior to the Closing Date; and (iii) product lines currently under development by Seller but not yet sold in the marketplace as of the Closing Date. Products in these Existing Product Lines are referred to herein as "Existing Products" and are set forth on Schedule A attached hereto. Existing Product Line(s) shall encompass variations of Existing Products, such as different colors, sizes, materials, surface treatments, manufacturing methods, etc., that are cosmetic in nature, or do not alter the basic design or functionality of the Existing Products.

([120.3] at § 1(i)). Products in these Existing Product Lines are referred to herein

as 'Existing Products.'" (Id.).

The Royalty Agreement defines Newly Developed Product Line(s) as:

> [A]ny products developed by Kids II after the Closing Date that do not fall within the Existing Product Lines, and which are (1) based on or derived from Existing Products or any intellectual property or proprietary technology embodied therein, or (2) partially or wholly conceived by David Silverglate or a member of his product development team during his affiliation with

3

> Kids II as an employee or independent contractor, and accepted as commercially viable by Kids II.

([120.3] at § 1(j)).  Products in the Newly Developed Product Lines are referred to herein as "Newly Developed Products."  (Id.).

The Royalty Agreement provides for a third category of products referred to as "Combined Product":

> On Occasion, an Existing Product or Newly Developed Product may be included or incorporated with or into an existing product or a newly developed product of Kids II from a division other than Rhino Toys, in a saleable unit (a "Combined Product").

([120.3] at § 2(b)).

The Royalty Agreement states that certain royalties are due on Net Sales for all Existing Products, Newly Developed Products, and Combined Products exceeding an agreed upon sales threshold.  ([120.3] at § 2)).  The Royalty Agreement sets a 5% royalty rate for "Existing Products," a 3% royalty rate for "Newly Developed Products," and a calculated rate for "Combined Products." The calculated rate for Combined Products is "based on the ratio of (i) the manufacturing Bill of Materials (BOM) cost of the Existing Product and/or Newly Developed Product to (ii) the total manufacturing BOM cost of the combined Product."  ([120.3] at § 2(b)).  Given that formula, the calculated rate for

Combined Products necessarily is lower than the 3% rate for Newly Developed Products.

The Royalty Agreement states that royalties would run "[f]or a period of seventy-five (75) years."  ([120.3] at § 2(a)(ii)).  The parties acknowledged, however, that "Existing Products and Newly Developed Products are not expected to remain commercially viable for seventy five (75) years, and nothing in this Agreement shall require Kids II to promote or market Existing Products or Newly Developed Products beyond the time they are commercially viable."  ([120.3] at § 2(a)(iii)).

2. <u>Royalties Paid</u>

Pursuant to the Royalty Agreement, Kids II manufactured, marketed, and sold Oball products identified in the Royalty Agreement as Existing Products. Kids II paid a 5% royalty on these products, which included variations on the original Oball as well as products incorporating the Oball "mesh," the linked loop structure of the Oball.

  

Fig. 2:  Oball Rainstick          Fig. 3:  Oball Football          Fig. 4:  O-Links

The parties identified thirteen Existing Products for which there is no dispute that a 5% royalty applies.  ([116] at 2-3).

Kids II also manufactured, marketed, and sold products that all parties agree are Newly Developed Products subject to a 3% royalty.  These products include a variety of designs incorporating the Oball mesh:

   

Fig. 5:  Oball Shape Sorter     Fig. 6:  Oball Soccer Ball     Fig. 7:  Oball Shaker

The parties identified seven Newly Developed Products for which there is no dispute that a 3% royalty applies.  ([116] at 2-3).

According to Defendants, Plaintiffs paid $2,131,413 in royalties over the period from 2012 to 2016.   ([133] at 9).

3.     The Royalty Dispute

Over time, Kids II manufactured, marketed, and sold an increasing number of products having Oball features that all parties agree are not Existing Products. The parties disagreed on whether these new products should be categorized as Newly Developed Products subject to a 3% royalty or Combined Products subject to a calculated royalty rate less than 3%. On November 3, 2015, XRT sent a demand letter to GOT I acknowledging that, as of September 15, 2015, Plaintiffs had paid $1,283,411 in royalties, but claiming $193,621 in unpaid royalties. ([120.6] at 13). That represented a 13.1 percent underpayment in royalties ($193,621 in unpaid royalties divided by total royalties owed ($1,283,411 in paid royalties plus $193,621 in unpaid royalties)).[2] ([120.6] at 13). The parties discussed the issues raised in the demand letter, but were unable to resolve their dispute. ([18] at ¶ 32).

B.     Procedural History

On January 6, 2016, two months after receiving the demand letter, Plaintiffs filed this action seeking a declaratory judgment as to their rights under the Royalty

---

[2]     The letter characterizes the discrepancy as being "approximately 18%," including interest owed on the unpaid royalties. ([120.6] at 13). That figure is reached by improperly dividing unpaid royalties plus interest by the total royalties paid, not the total royalties owed.

Agreement. ([1]). Plaintiffs request a declaration that: (1) GOT I does not owe the unpaid royalties claimed in Defendants' November 2015 demand letter; and (2) the royalty rates that Defendants claim are due under the Royalty Agreement are incorrect. ([1] at ¶ 3).

Almost five months later, on June 1, 2016, XRT sent a "notice of material breach" of the Royalty Agreement to Kids II. ([133] at 12). Kids II continued to assert that it had not miscategorized any products, prompting XRT to terminate the agreement on July 1, 2016. XRT stopped accepting royalty payments from Kids II in July 2016, returning 2016 Q2 and Q3 payments back to Kids II. (Id.). Kids II created an escrow account for those payments and future payments. ([145.1] at 81).

The same day XRT terminated the agreement, the Defendants filed their Answer and Counterclaims. ([18]). The Defendants counterclaimed for breach of contract and breach of the implied covenant of good faith and fair dealing. ([18] at ¶¶ 37-48). The Defendants also sought declaratory relief concerning the appropriate royalties due under the Royalty Agreement as well as a declaration that, if Plaintiffs were not in material breach of the Royalty Agreement or APA, the Royalty Agreement is not terminated and remains in full force and effect. ([18] at ¶¶ 49-56).

On September 20, 2016, the Defendants moved for partial summary judgment seeking an order that the term "intellectual property" as used in the definition of Newly Developed Products includes trademarks. ([47.1]). The Defendants claimed that a product that contains or attaches an embedded OBALL trademark, or other trademark used with an Existing Product, is a "Newly Developed Product Line." The Court rejected that contention in a March 20, 2017, Order, denied the Defendants' motion, and granted Plaintiffs' cross-motion for partial summary judgment. The Court found that a product cannot be classified as a Newly Developed Product under the Royalty Agreement based solely on the use of a trademark. ([128]).

Though the Court's Order granting Plaintiffs' cross-motion for summary judgment narrowed the issues, the Defendants' claimed underpayment continues to grow. According to Defendants, Plaintiffs improper categorization of products resulted in an $834,851, or 28.14 percent, total underpayment of royalties for the period 2012 to 2016 as shown:

| | 2012 | 2013 | 2014 | 2015 | 2016 | TOTAL |
|---|---|---|---|---|---|---|
| **Amounts Owed** | $182,067 | $496,304 | $613,974 | $761,032 | $912,887 | **$2,966,264** |
| **Amounts Paid** | $181,442 | $457,671 | $472,046 | $516,880 | $503,374 | **$2,131,413** |
| **Balance Due to XRT** | $625 | $38,633 | $141,928 | $244,152 | $409,513 | **$834,851** |
| **Percent due to XRT:** | 0.34% | 7.78% | 23.12% | 32.08% | 44.86% | **28.14%** |

Defendants also seek accelerated damages for Plaintiffs' alleged material breach of contract in the form of the present value of its expected royalties for the 75-year duration of the Royalty Agreement, i.e. through 2085. The Defendants claim accelerated damages of $20,958,679 on the low end of its sales projections and $29,456,369 at the higher end of its sales projections. ([120.14] at 6).

Plaintiffs have filed several motions to challenge Defendants' claim for accelerated damages. First, Plaintiffs move for Partial Summary Judgment of No Material Breach [119], arguing that the underpayment of royalties cannot, as a matter of law, constitute a material breach and accelerated damages thus are not an available remedy. Second, Plaintiffs move to strike the expert reports of Defendants' damages experts, John Shurley and Richard Gottlieb [122], arguing that the damages opinions offered were not timely disclosed. Finally, Plaintiffs move for Partial Summary Judgment of No Damages [148], arguing that Defendants cannot establish an accelerated damages amount with reasonable

certainty because Defendants' claimed damages are based only on unreliable and speculative expert testimony that is inadmissible under *Daubert*.

Plaintiffs also moved for Partial Summary Judgment of No Partial Breach of Contract [151], arguing that Plaintiffs elected to pursue only a claim for general material breach, and have waived a claim for a partial breach. Plaintiffs further contend that, at a minimum, the parties' dispute concerning product classification is a proper issue for summary judgment. (Id.).

## II. DISCUSSION

### A. Legal Standards

#### 1. Summary Judgment

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56. The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). Once the moving party has met this burden, the nonmoving party must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282

(11th Cir. 1999).  The nonmoving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  Id.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  Where the record tells two different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment.  Id. "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  The party opposing summary judgment "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  Scott, 550 U.S. at 380 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).  A party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary

verdict." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quotations omitted).

2.    Delaware Contract Law

The parties agreed the Royalty Agreement is governed by Delaware law. See Koch Bus. Holdings, LLC v. Amoco Pipeline Holding Co., 554 F.3d 1334, 1338 (11th Cir. 2009) (applying Delaware law where the parties' contract provided Delaware law governed). Under Delaware law, the construction of a contract is a question of law. Rhone-Poulenc Basic Chem. Co. v. Am. Mot. ins. Co., 616 A.2d 1192, 1195 (Del. 1992). "[W]hen interpreting a contract, the role of a court is to effectuate the parties' intent." AT&T Corp. v. Lillis, 953 A.2d 241, 252 (Del. 2008) (quotation omitted). Under Delaware's objective theory of contract interpretation, a "court looks to the . . . words found in the written instrument" to determine the intent of the parties in entering into the agreement. Sassano v. CIBC World Mkts. Corp., 948 A.2d 453, 462 (Del. Ch. 2008). A court interprets these words according to their "common or ordinary meaning" from the point of view of an "objectively reasonable third-party observer." Id. Even the literal meaning of a contract must be rejected if it "would be clearly unreasonable and yield an arbitrary result." Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del. 1992); see also Beanstalk Grp., Inc. v. AM Gen. Corp., 283 F.3d 856, 860 (7th Cir. 2002) ("[A]

contract will not be interpreted literally if doing so would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek.").

Extrinsic evidence may only be introduced if an ambiguity exists in the language of the contract. A contract provision is not ambiguous simply because the parties disagree on its meaning. E.I. du Pont de Nemours & Co. v. Allstate Ins. Co., 693 A.2d 1059, 1060 (Del. 1997). Contract language is ambiguous only if it is reasonably or fairly susceptible of two or more different interpretations. Lamberton v. Traveler's Indem. Co., 325 A.2d 104, 106 (Del. Super. 1974).

B.    Analysis

Before the Court is a rather straightforward contract dispute which the parties have strained to transform into unreasonable and commercially intolerable windfalls to advance their respective litigation strategies. Plaintiffs brought this declaratory judgment action seeking a judicial interpretation of the Royalty Agreement, specifically how to interpret the product categories defined in the agreement. Five months later, Defendants declare that Plaintiffs materially breached the Royalty Agreement by the underpayment of royalties which, Defendants argue, entitle them to the present value of a 75-year royalty stream, which Defendants claim is in an amount in the order of $20-29 million. Plaintiffs

14

in response claim that Defendants, by asserting a general material breach of the Royalty Agreement, waived any claim to partial breach of contract and, because Defendants wrongfully terminated the Royalty Agreement based on an alleged general material breach, Plaintiffs are now not obligated to pay any royalties owed or which accrue in the future. The Court now evaluates the parties' litigating positions.

      1.   <u>Motion for Partial Summary Judgment of No Material Breach [119]</u>[3]

Plaintiffs contend that "the alleged partial underpayment [of royalties] in this case cannot constitute a material breach as a matter of law." ([145] at 7). Defendants assert that "an underpayment of royalties, standing alone, is sufficient for establishing a material breach" especially when the breaching party has not operated in good faith. ([133] at 3). Defendants seek compensation for Plaintiffs' alleged material breach in the form of accelerated damages (i.e. the present value

---

[3]    Because several of the documents the parties submitted in support of their briefs on the parties' cross-motions and other filings contain confidential and sensitive information, the parties filed their motions for leave to file matters under seal [121], [124], [127], [131], [143], [146], [150], [153], [158], [161], [164], and [167]. Having reviewed the contents of the documents the parties seek to seal, the Court finds they contain certain confidential and sensitive information, and the Court will allow the parties to file copies of the documents from which is redacted information the Court finds is confidential.

of royalty payments expected over the maximum 75-year life of the Royalty Agreement).

Under Delaware law, whether a breach of a contract is material is generally an issue of fact. Saienni v. G & C Capital Group, Inc., No. 96C–07–151, 1997 WL 363919, at *3 (Del.Super. May 1, 1997); 23 Richard A. Lord, *Williston on Contracts* § 63:3 (4th ed.1992). However, "[a]s is true of virtually any factual question, if the materiality question in a given case admits of only one reasonable answer (because the evidence on the point is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law." Norfolk S. Ry. Co. v. Basell USA Inc., 512 F.3d 86, 92–93 (3d Cir. 2008), citing Gibson v. City of Cranston, 37 F.3d 731, 736 (1st Cir.1994); accord Saienni, 1997 WL 363919, at *3; 23 *Williston on Contracts, *93 supra,* § 63:3. "Thus, in certain situations, it can be appropriate to determine the issue of material breach at the summary judgment stage." Id.; see Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co., 206 Wis. 2d 158, 185–86, 557 N.W.2d 67, 78 (1996) (applying Restatement factors and overturning jury verdict of material breach)

"A 'material breach' is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of

the contract or makes it impossible for the other party to perform under the contract." Medicalgorithmics S.A. v. AMI Monitoring, Inc., No. CV 10948-CB, 2016 WL 4401038, at *24 (Del. Ch. Aug. 18, 2016), judgment entered, (Del. Ch. Sept. 2, 2016). "[F]or a breach of contract to be material, it must 'go to the root' or 'essence' of the agreement between the parties, or be 'one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract.'" Id., citing eCommerce Indus., Inc. v. MWA Intelligence, Inc., No. CV 7471-VCP, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013). "Courts in Delaware look to Section 241 of the Restatement (Second) of Contracts for guidance regarding materiality of a breach." Id. Section 241 lists five factors to consider in determining materiality of a breach:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Id.  These materiality factors are "to be applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances." § 241 cmt a.  No single factor is dispositive.

        a.      <u>The Extent to Which the Defendants Will be Deprived of the Benefit Which They Reasonably Expected</u>

Accepting Defendants' interpretation of the Royalty Agreement and their assessment of royalties owed and paid, the maximum claimed underpayment is $834,851, or 28.14% of the $2,966,264 in royalties the Defendants claim is owed. Plaintiffs argue that the Court should find this royalty underpayment immaterial as a matter of law, citing a number of cases applying New York law and holding that royalty underpayments as much as 74% were not material breaches.  <u>See, e.g.</u>, <u>Nolan v. Sam Fox Publ. Co.</u>, 499 F.2d 1394, 1399 (2nd Cir. 1974) (a 74% underpayment of royalties was immaterial as a matter of law); <u>Jobim v. Songs of Universal, Inc.</u>, 732 F. Supp. 2d 407, 421-22 (S.D.N.Y. 2010) ("Universal's breaches regarding royalty payments, however, is not material since it was only partial; Universal paid some royalties to VM."); <u>PerkinElmer Health Scis., Inc. v. Agilent Techs., Inc.</u>, No. CIV.A. 12-10562-NMG, 2014 WL 4794396, at *6 (D. Mass. Sept. 24, 2014) (summary judgment of no material breach warranted because failure to pay royalties for a brief period at the end of the agreement's lifespan was not "substantial and fundamental" to the agreement's purpose.).

Delaware courts, however, have not squarely addressed this issue. The Court believes that the analysis which a Delaware court would apply is informed by certain commentaries and decisions from outside Delaware. Gibson v. City of Cranston, 37 F.3d 731, 736 (1st Cir. 1994), citing Michelin Tires (Canada), Ltd. v. First Nat'l Bank, 666 F.2d 673, 682 (1st Cir. 1981) ("In the absence of a definitive ruling by the highest state court, a federal court may consider analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand, taking into account the broad policies and trends so evinced.").

The cases cited by Plaintiffs are useful because New York and Delaware both apply the Restatement factors in determining whether a breach is material. See, e.g., eCommerce Indus., Inc. v. MWA Intelligence, Inc., No. CV 7471-VCP, 2013 WL 5621678, at *17 (Del. Ch. Sept. 30, 2013) ("Although New York law applied in Qualcomm and Delaware law applies here, under both New York law and Delaware law, a breach must go to the root of the parties' agreement to be material. In addition, both New York and Delaware courts look to the factors set forth in Section 241 of the Restatement to determine whether a breach is material."). New York, however, appears to be the only jurisdiction applying the Restatement factors for material breach that has adopted a rule that partial

underpayment of royalties is not a material breach as a matter of law.  The Court

cannot conclude that Delaware courts would necessarily hold that an

underpayment of royalties is never a material breach.  See, IGEN Int'l, Inc. v.

Roche Diagnostics GmbH, 335 F.3d 303, 315 (4th Cir. 2003) ("We think, for

example, that either Roche's failure to properly pay royalties or its breach of the

field restrictions was material.  Royalty payments were the chief benefit for which

IGEN bargained in this arrangement.").  To determine if an incomplete payment of

royalties is a material breach, the Restatement factors must be applied to the

specific circumstances here.

In this case, a 28.14% underpayment is meaningful but it is not, in and of

itself, substantial enough to preclude a finding on summary judgment that the

breach was not material.  The reasoning of the opinions applying New York law is

helpful.  Plaintiffs here paid royalties in an amount exceeding 71% of the royalties

Defendants claim were owed.  Nolan, 499 F.2d at 1399 ("The rationale of these

decisions is, of course, that an essential objective of a contract between a composer

and publisher is the payment of royalties, and a complete failure to pay means this

objective has not been achieved.  Here, however, Fox did pay 26% of the royalties

due to Nolan for the applicable six-year period, and this partial payment of

royalties due distinguishes this case from cases where there was total failure to pay the required royalties.").

The underpayment claimed by Defendant is less meaningful when the Royalty Agreement is considered as a whole. The Royalty Agreement incorporates the Asset Purchase Agreement by reference and the APA provides that royalty payments are part of the purchase price for the assets purchased from Defendants. ([120.3] at § 2(d)). Plaintiffs paid, at or near closing, over $4,450,000 for the assets of XRT and also paid Defendants $2,131,413 in royalties. ([145.2] at 5 No. 9). Defendants expected about $7,416,264 in cash and royalties, and acknowledged they received $6,581,413. The royalty payments received represents a purchase price underpayment of only 11.2%.

  b.    The Extent to Which the Defendants Can Be Adequately Compensated for the Royalty Underpayment

In this dispute, the payment of money is the core issue. This is not a case where the non-breaching party is not receiving some expected performance of some kind that is difficult, or impossible, to monetarily quantify. When the categorization of products is determined in this case, Plaintiffs' monetary obligations to Defendant will be known and quantified. Defendants can be fully compensated for the alleged maximum royalty underpayment of $834,851.

### c. The Extent to Which Plaintiffs Will Suffer Forfeiture

Plaintiffs would suffer a significant economic consequence if a material breach is found, and accelerated damages are awarded. Plaintiffs bargained for and received the right under the Royalty Agreement to compensate Defendants by payment of royalties over a scheduled period of years. An accelerated damages award, if a material breach is found, would be an extraordinary present payment of royalties the parties bargained to be paid over a 75-year period. To convert this long term payment period to a payment required to be paid immediately would, even discounted to present value, fundamentally undermine the bargain negotiated and agreed to by Plaintiffs. The unexpected, un-negotiated lump-sum payment based on accelerated damages would be on the order of $20-29 million. Assuming Defendants' accelerated damage calculation is credible, Plaintiffs would be required to shoulder the risk that the products on which royalties are required to be paid would be commercially viable long enough for Plaintiff to make sales of products on which the royalty was collected.

"While the doctrine of material breach is well established in general contract law, when contracting parties specifically provide for a resolution in the event that contract conditions are not met, then we must defer to their agreement." FB & I Bldg. Prod., Inc. v. Superior Truss & Components, a Div. of Banks Lumber, Inc.,

727 N.W.2d 474, 479 (S.D. 2007). Unlike others receiving compensation through royalties, Defendants did not negotiate for accelerated royalty payments in the event of underpayment or other noncompliance.[4] Cf. Lampert for Thomas K. Lampert Irrevocable Tr. v. Tams Mgmt., Inc., No. 5:15-CV-06746, 2016 WL 9110168, at *3 (S.D.W. Va. Mar. 11, 2016), aff'd sub nom. Lampert v. Tams Mgmt., Inc., 684 F. App'x 346 (4th Cir. 2017) (enforcing contract that required defendant to accelerate royalty payments by immediately paying the plaintiff $2,000,000). "It is a fundamental principle of contract law that parties have a 'broad right to stipulate in their agreement the amount of damages recoverable in the event of a breach,' and courts generally enforce such agreements." Id., at *6 (citations omitted). A finding of material breach and imposition of an accelerated royalty payment eviscerates the parties' agreed-upon remedy for underpayment and constitutes a significant forfeiture for Plaintiffs.

                      d.      The Likelihood that Plaintiffs Will Cure the Underpayment

Plaintiffs sought declaratory relief to define the parties' obligations under the Royalty Agreement and stand ready to meet those obligations. That Plaintiffs

---

[4]      Section 2(e) of Royalty Agreement states that the remedy for underpayment is "interest at the rate of one and one-half percent (1.5%) per month."

are financially capable of meeting them is underscored by the fact Plaintiffs have

escrowed royalty payments Defendants have refused to accept.  The likelihood that

Plaintiffs will cure any royalty underpayment is high.

> e. The Extent to Which the Behavior of Plaintiffs
> Comports with Standards of Good Faith and Fair
> Dealing

"Every contract imposes upon each party a duty of good faith and fair

dealing in its performance and its enforcement."  Restatement (Second) of

Contracts § 205.  Whether Plaintiffs' interpretation of the Royalty Agreement is

reasonable is an important consideration in evaluating Plaintiffs' good faith.  As

explained in Section II.B.4.b, *infra*, the Court finds that Plaintiffs' interpretation of

the Royalty Agreement is not unreasonable.  The Court does not consider the

alleged misclassification of products to be evidence that Plaintiffs did not act in

good faith in performing its duties under the Royalty Agreement.

The Defendants allegations that:  (1) Plaintiffs harbor ill will toward Mr.

Silverglate; (2) Plaintiffs employees privately called Mr. Silverglate derogatory

names in internal Kids II communications; and (3) Plaintiffs sought to negotiate a

buyout of the Royalty Agreement also do not evidence bad faith in the

*performance or enforcement* of the Royalty Agreement.  The question is not what

Plaintiffs thought or contemplated, or whether they wanted to negotiate a buyout,

but whether Plaintiffs *acted* in bad faith to undermine the agreement. Viewing the evidence in the light most favorable to the Defendants, the evidence shows that Plaintiffs acted reasonably when confronted with an increasingly important, but ambiguous, Royalty Agreement. Rather than repudiate or undermine the agreement, Plaintiffs sought to negotiate a resolution, eventually sought declaratory relief to resolve the dispute by requesting an interpretation of the Royalty Agreement terms, and escrowed royalty payments when Defendants terminated the agreement and refused to accept payments.

Defendants also make independent allegations of bad faith related to Defendants' performance under and enforcement of the Royalty Agreement. The Defendants principally contend that Kids II: (1) sought to "design around the Royalty Agreement," (2) developed a "secret scheme" to avoid paying royalties on products "partially or wholly conceived" by Mr. Silverglate during his employ with Kids II; and (3) "artificially deflated Oball sales in the fourth quarter of 2016." ([133] at 7, 19, 22). Defendants' basis for these claims are unfounded or at least a myopic and self-serving interpretation of Defendants' alleged conduct. For instance, the Defendants state that "XRT's toy expert believes Kids II artificially deflated Oball sales in the fourth quarter of 2016." ([133] at 19). Richard Gottlieb, in his report, does express his "belief" regarding fourth quarter 2016

sales, but the report does not contain any evidence or analysis supporting the "belief" that Defendants took action to "artificially" deflate Oball sales. The Court does not credit Mr. Gottlieb's unsupported belief that sales were suppressed. The Court notes that sales activity in the fourth quarter of 2016, in which Mr. Gottlieb claims suppression, occurred months after Defendants declared Plaintiffs in material breach and after Defendant terminated the Royalty Agreement.[5]

Considering Defendants' evidence in the light most favorable to Defendants, Defendants' claim of a "secret scheme" to suppress sales of products "partially or wholly conceived" by Mr. Silverglate fails scrutiny. At most, the evidence establishes the existence of separate Oball development teams where only products originating from Mr. Silverglate's team were designated as Newly Developed Products. Defendants' real complaint, as with their "design around" allegations, is that Plaintiffs sought to develop royalty-free products or products subject to the lowest royalty available. This is not evidence of bad faith performance of the Royalty Agreement.

The Royalty Agreement does not obligate Plaintiffs to develop Newly Developed Products or Combined Products or refrain from developing products

---

[5]     Defendant terminated the agreement on July 1, 2016.

that compete with royalty-bearing products.  The Royalty Agreement obligates Plaintiffs to "use commercially reasonable efforts to sell the Existing Products, Newly Developed Products, and Combined Products, if any" and pay royalties when such products are sold.  ([120.3] at § 2(f)).  Defendants did not negotiate to repurchase rights attaching to Newly Developed Products or Combined Products. They did negotiate a provision to cover instances where lack of production or distribution of Existing Products or poor sales of Existing Products occurred ([120.3] at § 2(f)).  This further demonstrates the agreement does not impose an obligation on Plaintiffs to develop royalty-bearing products.  It obligates the payment of agreed upon royalties if they did.  The agreement, in one instance, restricts Plaintiffs ability to develop and market royalty-free products by imposing an obligation on Plaintiff to avoid marketplace interference in Plaintiff's sales of the BENDY BALL product and the Existing, Newly Developed, and Combined Product Lines.  ([120.3] at § 2(a)(iii)).  The Royalty Agreement does not preclude Plaintiff from the development and marketing of other products that are not subject to royalties under the Royalty Agreement.

"The implied covenant of good faith and fair dealing cannot properly be applied to give the plaintiffs contractual protections that they failed to secure for themselves at the bargaining table."  Winshall v. Viacom Int'l, Inc., 76 A.3d 808,

816 (Del. 2013), as corrected (Oct. 8, 2013). "[T]he implied covenant is not a license to rewrite contractual language just because the plaintiff failed to negotiate for protections that, in hindsight, would have made the contract a better deal." (Id.) Plaintiff's effort to develop non-royalty-bearing products is not evidence of Plaintiff's bad faith performance of the Royalty Agreement.

The Court accepts as true, for purposes of summary judgment, the Defendants' allegations that Plaintiffs were not entirely forthcoming in explaining their methodology for categorizing products and that Plaintiffs changed the categorization of some products without notifying Defendants. The Royalty Agreement obligates Plaintiffs to "keep complete and accurate production and accounting records relating to the sales" of royalty-bearing products and to provide "free and full access to such records for audit purposes" during normal business hours. ([120.3] at § 2(a)(iii)). Plaintiffs production of royalty reports largely satisfies that obligation and Plaintiffs are not required to divulge privileged communications with its attorneys regarding product classification, as Defendants suggest. ([133] at 21). The evidence supports that Plaintiffs did not always respond in good faith to Defendants' requests for royalty-related information. On balance, however, the evidence demonstrates that Plaintiffs operated with

substantial good faith in the performance of its contractual obligations, even when considering all the evidence in the light most favorable to Defendants.

All of the Restatement factors for assessing the materiality of a breach, when considered in the light most favorable to the Defendants, favor a finding of no material breach and the Court determines that no reasonable jury could conclude that Plaintiffs' underpayment of royalties defeated the essential purpose of the Royalty Agreement. Plaintiffs made an initial payment of over $4,450,000, applied a reasonable construction of the ambiguous Royalty Agreement, paid at least 71% of royalties owed, sought a judicial declaration defining their obligations under the agreement when a dispute understandably arose, continued to pay royalties, and escrowed royalty payments Defendants refused to accept after terminating the agreement. Accepting Defendants' interpretation of the Royalty Agreement and Defendants' assessment of unpaid royalties, the Court finds Plaintiff did not commit a material breach of the Royalty Agreement and Plaintiff's Motion for Partial Summary Judgment of No Material Breach [119] is granted.

      2.    <u>Motion to Strike Expert Reports of John Shurley and Richard Gottlieb [122]</u>

The Court's grant of Plaintiff's Motion for Partial Summary Judgment of No Material Breach moots Plaintiff's Motion to Strike as it pertains to Defendants' expert testimony to support their claim to accelerated damages. ([122] at 6).

Plaintiffs also assert that Defendants improperly added expert opinions on past damages after filing opening reports that omitted that analysis. (Id.). The Court considers the Motion to Strike Mr. Shurley's and Mr. Gottlieb's expert testimony on past damages.

Plaintiff argues that the Court ordered Defendant to disclose expert damages testimony by January 5, 2016. The Court did not.

On December 21, 2016, the Court conducted a telephone conference to resolve a discovery dispute. During the conference, the Court ordered the parties to file their "Fact Disclosure" listing each item of alleged damage to which the party contends it is entitled to recover in this action, including the amount of damage claimed, the factual basis for each damage item, identification of documents supporting the damaged claimed, and identification of the person who has the most comprehensive knowledge about the damage claimed. ([93] at 2). The Defendants complied with that order, specifying damages for unpaid royalties of $567,779 from 2012 to July 1, 2016, identifying Kids II royalty reports as supporting documents, identifying Sheila Kellerman and their damages expert, John Shurley, as most knowledgeable, and listing all the product skus for which a royalty dispute existed. ([101] at 5; [101.1]). Defendants chose to submit the

preliminary opinions of its damages experts in support of their claim for accelerated damages.

By requiring the Fact Disclosure, the Court did not change the set schedule, set on August 2, 2016, for submission of expert reports, which required service of initial expert reports by January 27, 2017. ([33]). By submitting preliminary opinions of Defendants' damages experts in response to the ordered Fact Disclosure, Defendants did not waive their rights to submit initial expert reports by January 27, 2018.

Plaintiffs' opening expert reports, filed on January 27, 2017, included information on unpaid royalties. Mr. Gottlieb's expert report listed the products in dispute, identified the royalty rate Defendants believe applied to each product, identified the royalty rate Defendants assert Plaintiffs paid, and listed sales, "royalty as paid," and "royalties per XRT rates" for each product from 2012 through the 2nd Quarter of 2016. ([120.9] at 41-51, 66-75). The inclusion of updated 2016 sales information and an aggregate amount for unpaid royalties in the Gottlieb report served on February 14, 2017, and Mr. Shurley's reliance on that information in his February 20 expert report, is not grounds to strike the reports. Plaintiffs were well aware of the Defendants' claim for unpaid royalties, the products for which Defendants believed additional royalties were owed, the rate

Defendants believed applied, the royalties paid by Plaintiffs for each product, and the royalties Defendants claim are owed for each product. Plaintiffs were not prejudiced by the updating of unpaid royalties in the reports served on February 14 and February 20, 2017.

The Plaintiffs' Motion to Strike Expert Reports of John Shurley and Richard Gottlieb [122] as they relate to past damages[6] is denied.[7]

### 3. Motion for Partial Summary Judgment of No Damages [148]

Plaintiffs characterize their Motion for Partial Summary Judgment of No Damages as raising an "additional ground for judgment against Defendants' claim for accelerated damages." ([148] at 5). The Court's grant of partial summary judgment of no material breach resolves the issue of accelerated damages. Plaintiffs' motion for partial summary judgment of no damages is denied as moot.

---

[6] Because the Court granted Plaintiff's Motion for Partial Summary Judgment of No Material Breach, testimony concerning accelerated damages is irrelevant and Plaintiff's Motion to Strike as it pertains to accelerated damages is denied as moot.

[7] If Plaintiff contends any information in the February 14 and February 20, 2017, reports was not available to Plaintiff when Defendants' experts were deposed, Plaintiff may identify, on or before March 15, 2018, the specific information they claim was not provided, and what additional testimony they would seek if a further deposition were allowed.

### 4. Motion for Partial Summary Judgment of No Partial Breach [151]

Plaintiffs make three arguments in support of their motion for partial summary judgment of no partial breach of contract. First, Plaintiffs argue that Defendants waived their claim for partial breach of contract.[8] Second, Plaintiffs argue that Defendants have not presented evidence sufficient to prove a partial breach. Finally, if the first two arguments fail, Plaintiffs request that the Court enter summary judgment rejecting Defendants' proposed interpretation of the Royalty Agreement and finding that Kids II has correctly classified the products at issue. ([152] at 6-7).

#### a. Alleged Waiver of Partial Breach Claim

Plaintiffs assert that Defendants did not sufficiently plead a claim for partial breach of contract and that Defendants made a "strategic choice to seek contract termination and repudiation rather than compensation for the alleged underpayment of royalties." ([152] at 13). Plaintiff maintains that "[b]y making

---

[8] Plaintiffs ultimately seek dismissal of the entire action, stating that "[i]f the Court grants summary judgment of no partial breach and no material breach, Kids II requests that the Court dismiss Kids II's declaratory judgment claims as moot. ([152] at 7 n. 1).

that choice Defendants failed to put Kids II on notice of any partial breach claim they may wish to make." (Id.). The Court disagrees.

Defendants' first claim for relief is one for "Breach of Contract." ([75] at 22). Defendants allege an underpayment of royalties and damages as a result of Plaintiffs' "breach of contract." (Id. at ¶¶ 37, 40). That Defendants characterize the breach as material does not preclude Defendants from recovering damages for a partial breach of contract. "A litigant is not required to make an election of remedies at his peril." Wilson v. Pepper, 608 A.2d 731 (Del. 1992), citing Stockman v. McKee, Del.Super., 71 A.2d 875, 879 (1950). Defendants counterclaims also include two requests for declaratory relief in which the Defendants request the Court to find that (1) Plaintiffs underpaid royalties and that "[d]amages are owed as a result of GOT I and Kids II's conduct;" and (2) "the Royalty Agreement is not terminated and remains in full force and effect" should the trier of fact determine that Plaintiffs are not in material breach. ([75] at ¶¶ 52, 54). The Defendants counterclaims provide adequate notice of Plaintiffs' claim for damages for partial breach of contract.

The record developed in this case reflects that Defendants seek damages for unpaid royalties. For instance, the Defendants' response to the Court's required Fact Disclosure detailed the damages for unpaid royalties sought. Defendants

stated that "Kids II and GOT I ultimately failed to pay over $567,000 in royalties between 2012 and July 1, 2016." ([101] at 1).  Defendants stated they were entitled to the "benefit of the bargain" which included "past due royalties that were not paid from 2012 to July 1, 2016" in the amount of $567,779.  (Id. at 5).  The Court finds that Defendants did not waive their claim to damages for partial breach of contract.  Indeed, it was Plaintiffs who sought declaratory judgment to determine whether it owed further royalties to Defendants.

        b.      <u>Interpretation of Product Categories</u>

The Court now turns to the central dispute in this action—the proper classification of products given the definitions provided in the Royalty Agreement. "When the issue before the Court involves the interpretation of a contract, summary judgment is appropriate only if the contract in question is unambiguous." <u>Matthew v. Laudamiel</u>, No. 5957-VCN, 2012 WL 2580572, at *5 (Del. Ch. June 29, 2012).  "Ambiguity exists "when the provisions in controversy are reasonably or fairly susceptible [to] different interpretations or may have two or more different meanings."  (<u>Id.</u>).

The critical inquiry here is whether the Royalty Agreement unambiguously supports the Plaintiffs' construction of Combined Products.  Plaintiffs contend there are two types of Combined Products:  (1) products where the Oball Mesh

makes up part of the overall toy (e.g. the O-Copter); and (2) entertainers and play gyms with Oballs mounted to them, or Oballs included as part of the overall toy (e.g. the bounce-o-bunch activity center). ([152] at 17). Plaintiffs' core



argument is that having a component in a toy that is royalty bearing does not make the entire toy a Newly Developed Product. Plaintiffs contend that such royalty bearing components have been "incorporated" into the product as contemplated by the definition of "Combined Products."



The Defendants contend that products "evoking the dimpled linked-loop design of the Oball (whether in mesh or embedded in hard plastic) are Newly

| Existing Product | Newly Developed Product (Disputed) |
|---|---|
| | |
| | |

Developed Products." ([160] at 23). Defendants maintain that such products are

"based on" Existing Products, or proprietary technology embodied by the Existing

Products, because Existing Products provided a "foundation or starting point" for

those products.  Defendants further contend that Combined Products should be

interpreted to cover only products that include or incorporate complete products,

not just a component part.  ([160] at 25).

The Court begins its analysis with the plain and ordinary meaning of the

contract language.  The Royalty Agreement defines "Combined Product" in

Section 2(b):

> On Occasion, an Existing Product or Newly Developed Product may
> be included or incorporated with or into an existing product or a newly
> developed product of Kids II from a division other than Rhino Toys, in
> a saleable unit (a "Combined Product").

([120.3] at § 2(b)).  "Included" means "To have, put in, or incorporate as part of a

whole."  (Id.).  Oxford English Dictionary, available at http://www.oed.com.

"Incorporate" means "[t]o combine or unite into one body or uniform substance"

or "[t]o put into or include in the body or substance of something else; to put (one

thing) in or into another so as to form one body or integral whole."  (Id.)  A

"product" is "[a]n article or substance that is manufactured or refined for sale[.]"

(Id.).  The Royalty Agreement defines "Existing Products" as those listed in

Schedule A.  ([120.3] at § 1(i)).

The Court, in an earlier summary judgment ruling, construed "Newly Developed Product," finding that "[t]he more reasonable, and natural, interpretation, is that a Newly Developed Product is a product that is based on or originates from the Existing Products or a patent or other proprietary technology embodied by the Existing Products." ([128] at 10).

Given the plain and ordinary meaning of the terms defining Combined Products and Newly Developed Products, the Court finds that the interpretations offered by Plaintiffs and Defendants are both reasonable and that the Royalty Agreement is ambiguous. The universe of products included within a reasonable construction of Combined Products overlaps the universe of products included within a reasonable construction of Newly Developed Products. The Royalty Agreement does not provide sufficient guidance to discern whether a new product is "based on or originates from the Existing Products or a patent or other proprietary technology embodied by the Existing Products" (i.e. a Newly Developed Product) or merely "includes or incorporates" an Existing Product or Newly Developed Product (i.e. a Combined Product). The ambiguity is particularly acute for products like the O-copter that incorporate the Oball mesh as a component of the toy.

Plaintiffs' interpretation is reasonable in that it gives full consideration to the term "incorporated" as used in Combined Products. "Incorporated" contemplates uniting two products into a single integral whole. Its use in the definition of Combined Products suggests that Combined Products are not limited to the selling of two products packaged or fixed together, as Defendants contend. That one could reasonably view a toy that merely incorporates a royalty bearing component as not being "based on" or "originating from" an Existing Product, or the intellectual property or technology embodied therein, and thus not a Newly Developed Product, further supports Plaintiffs' interpretation. The Royalty Agreement also defines Existing Product as including "Products Under Current Development" and product portions in Schedule A. ([120.3] at 21, 37 (product 69)). That discredits Defendants' argument that Existing Product must "refer to finished products offered for sale" ([160] at 25) and also supports Plaintiffs' interpretation that "Combined Products" contemplates incorporation of royalty bearing components in addition to finished products. Combined Products could reasonably be interpreted as including toys, like the O-copter, that have an Oball mesh as a component of the toy.

Defendants' interpretation is also reasonable in that it gives full consideration to the ordinary meaning of the term "product." Because the

definition of Combined Product contemplates including or incorporating two products, it could reasonably be interpreted to cover only toys that originate from two independent products (like the activity center with an Oball), rather than those that merely incorporate a feature like the Oball mesh that, when separated, are merely product components. That the definition of Combined Products states that such combinations would happen "on occasion"[9] further supports the Defendants' narrower interpretation of that product category.

The Royalty Agreement is susceptible to two equally reasonable, but conflicting, interpretations. Because reasonable minds could differ as to the Royalty Agreements meaning, a factual dispute exists and summary judgment is not appropriate. GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P., 36 A.3d 776, 783 (Del. 2012). At trial, the trier of fact will consider admissible extrinsic evidence and look beyond the Royalty Agreement to ascertain the parties' intentions. (Id.).

---

[9] "On occasion" means "as need or opportunity arises; now and then, occasionally." Oxford English Dictionary, available at http://www.oed.com.

c.      <u>Sufficiency of Defendants' Evidence of Partial Breach</u>

The Plaintiffs advance a variety of arguments that Defendants lack sufficient evidence to sustain a claim to partial breach and, therefore, summary judgment is warranted.  For purposes of summary judgment, the Court must accept the Defendants' reasonable interpretation of the ambiguous Royalty Agreement. Viewing all evidence in the light most favorable to Defendants, the Court finds that a jury could reasonably conclude that Plaintiffs have miscategorized the products at issue and owe additional royalties.

Because this case turns on the meaning of the contract terms Newly Developed Products and Combined Products, the Court initially considers whether the language of the agreement, especially, the Existing, Newly Developed, and Combined Product definitions cause the Combined Product definition to be ambiguous.  The plain language leads the Court to consider it is.  The evidence supports this conclusion.  Defendants' witnesses have offered testimony concerning their understanding of the contract terms and their view regarding the proper categorization of products.  For instance, Mr. Silverglate testified at his deposition that "[i]f you were to pull out the royalty agreement and read the definition of what a newly developed product is versus a combined product, you would see that a combined product would be taking a complete Rhino Toys

product and putting it in a product of another division of Kids II and selling it in that division." ([152.12] at 163:18-164:15; <u>see</u> <u>also</u> [152.12] at 174:3-14, 222:1-223:18, 227:22-229:6, 236:12-241:11, 243:1-244:2). As another example, Mr. Alleman, XRT's intellectual property attorney, testified about his understanding of the Royalty Agreement and the classification of products under the Royalty Agreement. ([160.29] at 45:17-47:24, 52:15-53:2, 53:16-57:13). To the extent Defendants' witnesses were not able to answer certain questions about the Royalty Agreement or product classification under the Royalty Agreement, Plaintiffs will have an opportunity to cross-examine them about it at trial.

Plaintiffs fail to show that they are entitlement to summary judgment based on Defendants' interpretation of the Royalty Agreement. The Royalty Agreement is ambiguous and there exists significant genuine issues of material fact regarding the proper classification of products under the Royalty Agreement.

The Plaintiffs' Motion for Partial Summary Judgment of No Partial Breach is denied.

## II.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiffs GOT I, LLC and Kids II, Inc.'s Motion for Partial Summary Judgment of No Material Breach [119] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs GOT I, LLC and Kids II, Inc.'s Motion to Strike Expert Reports of John Shurley and Richard Gottlieb [122] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs GOT I, LLC and Kids II, Inc.'s Motion for Partial Summary Judgment of No Damages [148] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Plaintiffs GOT I, LLC and Kids II, Inc.'s Motion for Partial Summary Judgment of No Partial Breach of Contract [151] is **DENIED**.

**IT IS FURTHER ORDERED** that the parties' motions to file matters under seal [121], [124], [127], [131], [143], [146], [150], [153], [158], [161], [164], and [167] are **GRANTED**.

**SO ORDERED** this 27th day of February, 2018.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE